REYNOLDS *v.* DIVISION OF PAROLE
AND COMMUNITY SERVICES.

(No. 82-04234 — Decided
October 7, 1985.)

Court of Claims of Ohio.

*John E. Rockel,* for plaintiff.
*Anthony J. Celebrezze, Jr.,* attorney
general, and *Mark T. D'Alessandro,* for
defendant.

*Per Curiam.* This matter came on
for trial in the Court of Claims of the
state of Ohio, on September 9, 1985,
before a three-judge panel assigned by
the Supreme Court of Ohio pursuant to
R.C. 2743.03(C).

This matter was previously before
the Supreme Court of Ohio in *Reynolds
v. State* (1984), 14 Ohio St. 3d 68, in
which the judgment of the court of ap-
peals was reversed and the cause was
remanded to the Court of Claims for fur-
ther proceedings in accordance with the
opinion of the Supreme Court. At the
commencement of this trial, David
Harold Reynolds, husband of plaintiff,
Debbie Lee Reynolds, withdrew his se-
cond cause of action.

In the evening hours of July 7, 1981,
Mrs. Reynolds was brutally assaulted
and raped by Earl Elder, a convicted
felon, then living at the Cincinnati
Reintegration Center, a place where in-
mates are assigned prior to parole.
After assaulting her, Elder dragged her
body into the kitchen, turned on the
stove and placed her body head first into
the gas oven. As a result of the assault
and subsequent oxygen deprivation,
Mrs. Reynolds has been left almost com-
pletely paralyzed, and is now confined to
a hospital bed, requiring constant
medical attention.

The focus of this case is the defen-
dant's control and supervision of Elder,
prior to July 7, 1981, and whether that
supervision was negligent so as to make
the defendant liable for the horrible
tragedy that befell Mrs. Reynolds. As
mentioned above, Elder was a convicted
felon. In 1976, he was out driving with
Dorothy Sullivan when he slit her
throat, stripped off her clothes, and
threw her into a gravel pit. Dorothy's
body was found soon afterward in the
shallow water. Elder was convicted of
manslaughter and sentenced to five to
twenty-five years' imprisonment. In

1981, Elder was granted a work release furlough pursuant to R.C. 2967.26. It was while he was on furlough that he committed the assault upon Mrs. Reynolds. R.C. 2967.26 permits the Adult Parole Authority to grant furloughs to certain prisoners to aid in their rehabilitation by allowing them to participate in educational and work training programs. A prisoner who is granted such a furlough is required by R.C. 2967.26(B) "[to] be confined for any periods of time that he is not actually working at his approved employment or engaged in a vocational training or other educational program."

The decision of the parole authority to furlough Elder is not an issue in this case. As stated by the Supreme Court: "* * * [P]laintiffs may not maintain an action against the state for its decision to furlough a prisoner. However, once such a decision has been made pursuant to R.C. 2967.26, a cause of action can be maintained against the state for personal injuries proximately caused by the failure to confine the prisoner during non-working hours in accordance with R.C. 2967.26(B). Such a failure to confine is negligence *per se,* and is actionable pursuant to R.C. 2743.02." *Reynolds* v. *State, supra,* at 70.

Plaintiff's case therefore turns on the conduct of the defendant after the decision was made to furlough Elder. The alleged acts of negligence involve the Cincinnati Reintegration Center both in its general operation and in its handling of Elder. There are two theories of law by which the defendant could be found liable in this case. The first theory is that of negligence *per se* as stated by the Supreme Court above.

The second theory is ordinary negligence arising out of a duty owed the public to protect it from the foreseeable threat posed by one such as Elder.[1] The basis of this theory of liability may also be found in the Supreme Court's opinion in *Reynolds, supra,* at 70:

"The language in R.C. 2743.02 that the 'state' shall 'have its liability determined * * * in accordance with the same rules of law applicable to suits between private parties * * *' means that the state cannot be sued for its legislative or judicial functions or the exercise of an executive or planning function involving the making of a basic policy decision which is characterized by the exercise of a high degree of official judgment or discretion. However, once the decision has been made to engage in a certain activity or function, the state may be held liable, in the same manner as private parties, for the negligence of the actions of its employees and agents in the performance of such activities."

Plaintiff's argument on the first theory is that R.C. 2967.26 required the director and counselors of the Cincinnati Reintegration Center to keep Elder confined when he was not at work. Therefore, the very fact Elder was present in Mrs. Reynolds' home shows negligence on the part of the reintegration center since he was obviously not confined, or at work, when he was at Mrs. Reynolds' home assaulting her. On a theory of ordinary negligence plaintiff argues that the threat Elder posed to the community was apparent, and the consequences of allowing him to roam free outside the reintegration center were foreseeable. Further, the conduct of the defendant both in running the reintegration center

---

[1] See *State* v. *Silva* (1970), 86 Nev. 911, 478 P.2d 591, 44 A.L.R. 3d 891. In *Silva,* plaintiffs alleged that the state had negligently maintained a prison honor camp thereby permitting an inmate to escape and to commit a forcible rape of plaintiff-wife. The court ruled that although the selection of inmates for the honor camp could be characterized as a discretionary act, the state was not entitled to immunity because the manner in which the camp was supervised and controlled was mainly "operational" in nature.

and in supervising Elder was negligent, and the proximate cause of the horrible injuries suffered by Mrs. Reynolds.

Defendant counters the first argument of the plaintiff by focusing on the word "confinement" in R.C. 2967.26, as used by the Supreme Court. The Supreme Court based its finding of a possible cause of action for negligence *per se* on the defendant's "failure to confine the prisoner during non-working hours." *Reynolds* v. *State, supra,* at 70. Defendant, however, maintains the Supreme Court failed to define the term "confinement" in its opinion, and it proposes the definition contained in Ohio Adm. Code 5120:1-1-01(G):

"Confinement: 'Confinement' consists of those restrictions placed on a releasee or inmate as to particular places or situations as specified by the department of rehabilitation and correction or any of its agencies. The principal place of confinement shall be the institution, agency, or suitable facility designated by the department of rehabilitation and correction."

Under this definition, argues defendant, a prisoner could be considered "confined" pursuant to R.C. 2967.26 even while away from the reintegration center, and not at work, if he were under restrictions placed on him by the Department of Rehabilitation and Correction. The furloughees at the Cincinnati Reintegration Center were allowed to visit certain people, such as relatives, during the evening hours, if they checked in at the center after work and returned to the center before 11:00 p.m. This was called "supplemental time" and defendant argues Elder was "confined" by the restrictions placed on him during this supplemental time. Thus, defendant would not be negligent *per se* if Elder committed any offense while on supplemental time because he was still "confined" pursuant to R.C. 2967.26.

The position of the defendant with regard to the allegations of ordinary negligence is that the injuries suffered by Mrs. Reynolds were not a foreseeable result of any negligence which might have occurred at the reintegration center. Elder had been furloughed in March 1981, and had come in contact with numerous people before July 7, 1981, without any adverse results. Thus, his actions on that night were not foreseeable and the failure of the defendant to confine Elder on that night was not the proximate cause of Mrs. Reynolds' injuries.

Considering both theories of negligence the issues of liability before this court are as follows:

(1) whether the defendant was negligent *per se* in allowing Elder to be away from the reintegration center on the night he assaulted Mrs. Reynolds;

(2) whether the defendant was negligent in its administration and control of the Cincinnati Reintegration Center during the period Elder was a resident of the center;

(3) whether the defendant was negligent in its supervision of Elder while he was a resident of the reintegration center; and

(4) whether any act of negligence on the part of the defendant was foreseeable, and the proximate cause of the injuries suffered by Mrs. Reynolds.

For the reasons outlined below this court finds in the plaintiff's favor on all these issues of liability.

On the issue of negligence *per se,* this court does not agree with the defendant's contention that the Supreme Court was unclear in its finding of a failure to confine Elder as required under R.C. 2967.26. This statute contains its own definition of "confinement" in the very next sentence after the one used by the Supreme Court to support its finding of negligence *per se.* R.C. 2967.26(B) begins, "[a] prisoner who is granted a furlough pursuant to this section shall be confined for any periods of time that he is not actually

working at his approved employment or engaged in a vocational training or other educational program.'' The next sentence reads, "[t]he confinement shall be in a suitable facility that has been licensed by the adult parole authority * * *.'' The confinement referred to is *in* or *inside* a facility, not roaming the streets under some theoretical restrictions, the latter condition being analogous to probation or parole. There is no need to turn to the Ohio Administrative Code for a definition of "confinement" when such a definition is provided by the very statute that one seeks to interpret. In addition, the delineation by the legislature of the specific times when a furloughee was allowed to be unconfined, *i.e.,* while working at his approved employment or engaged in a vocational training or other educational program, shows an intent by the legislature to severely limit the amount of time a furloughee was not actually in the facility. However, even if the definition of confinement proposed by the defendant is used, there was still a failure to confine Elder by the defendant that constitutes negligence *per se.*

The record shows a shocking failure on the part of the staff of the Cincinnati Reintegration Center to account for the supplemental time of the furloughees in residence there at the time of this incident. While this will be discussed in more detail below, suffice it to say that to describe the supplemental time of the furloughees as "confinement" makes a mockery of the word. Under the definition proposed by the defendant, confinement includes "restrictions" placed on a furloughee. These restrictions would include the rules of the reintegration center regarding supplemental time. Yet the record is replete with infractions of the supplemental time rules that went unpunished, and shows that the restrictions placed on the furloughees were so flagrantly violated that they existed only on paper. Finally, Mrs. Reynolds was not on Elder's approved visitor list and he had no permission to be at her house the night of the assault. Under any definition of confinement you may choose, Elder was not confined when he assaulted Mrs. Reynolds and this amounts to negligence *per se* on the part of the defendant.

Turning to the issues of ordinary negligence, this court again finds the defendant liable. Even absent the specific statutory mandate requiring confinement of furloughees during non-working hours, the negligence of the defendant in supervising the Cincinnati Reintegration Center provides a basis for liability. Beyond the specific instance of Elder's absence on the day of the assault, the testimony of numerous witnesses shows his absence was not an isolated incident but was rather part of an ongoing course of negligence that can only be described as shocking. A daily log was kept at the reintegration center in which was recorded, by counselors and other supervisory personnel, some of the occurrences at the center. It would be unfair to say that there was a total lack of concern on anyone's part with the way the place was run, but a note of concern expressed by furlough officer, John Dean, may best serve as an illustration of the point to which respect for rules and procedure had degenerated.

An entry in the log book for April 29, 1981, reads:

"NOTICE: All residents at the center have chosen to change our center policies. It must be acceptable because no one has spoken up but me. 1) no one gets out of bed by 6:30 A.M., I know because there're all in bed when I come to work at 8:00 A.M.; 2) no one does their house duty until they feel like it. I know because I beg them to do it every morning. I hear staff say sometimes work here is like babysitting. Well who in the hell is going to babysit staff. Good question. I have also noticed there are a

good ten iteneraries [*sic*] with absolutory [*sic*] nothing at all on their supptime [*sic*] side. What kind of _____ is that.

"So what's the problem, or maybe no one sees a problem. Some people should feel guilty to accept a pay check. Better yet why don't we start calling them welfare checks. Once these elementary tasks are done on a daily basis. We can start addressing real important problems in areas such as counseling programming and taking control of your clients instead of the clients controlling you. * * *"

Other entries in the log support the conclusion of Dean that the furloughees paid little if any attention to the rules of the center.

April 15, 1981:

"3rd shift — *TO ALL COUNSELORS*

"When I entered third shift everyone didn't seem to know what curfew was. The residents stated that the other counselors did not enforce curfew all the time.

"Counselors if we don't do the same things and be consistent how can we expect residents to know what's going on.

"Residents' curfew in bed lights out 10 Sunday — Thursday *no exceptions* wake up — 6:00 A.M. everybody, even people working second shift or off that day.

"The counselors are letting the residents take control and this is wrong."

April 18, 1981:

"2:50 A.M. This writer heard strange noises in the room above the oval office. Upon making the investigation on the room where noises were heard this writer discovered a woman in Mr. Drennen's room 206. While this writer was telling the young lady she had to leave the center Mr. Good showed up on the premises. This writer then asked Mr. Good did he know the young lady? Mr. Good denied he knew her.

After vacating the young lady from Mr. Drennen's room this writer spoke with Mr. Good again about the young lady and Mr. Good admitted that he knew the lady and went on to confess the full story after this writer urged Mr. Good to tell the truth. This writer then had a short meeting with Mr. Good & Drennen about the situation. Mr. Good stated, 'she tricked a _____ into bringing them back from Middletown.' Mr. Drennen was silent during the meeting. This writer placed both men on indefinite room restriction until Monday morning when more definite decision can be made. At 6:00 A.M. Mr. Good was AWOL during head count."

June 4, 1981:

"All counselors: It was noted on 6-2-81, by supervisor J.E. McCory that counselors are not properly planning their clients' itinerary sheets. Some clients are being signed out for 3 & 4 hours of one interview, can you believe that * * *[?]"

July ?, 1981:

"Craig Page came in 28 minutes late. He stated that his son was burned by fireworks and was at the hospital until 11:19, but did not arrive at center until 12:28 a 1 hour and 10 minute difference. It does not take that long to go from Middletown to Cincinnati.

"Clyde Bennet returned to center at 1:55 A.M. stating he had car trouble. The starter cable was loose. A mechanic came to fix the car."

July 7, 1981:

"Mr. Charles Hester failed to call from work to switch over the supplemental time. Subject has been drinking quite a bit over the last two weeks. I spoke to this man about his drinking. He indicated that he would cut down to weekend drinking.

"Mr. H. Daughtery was suspected of smoking pot on 3rd floor * * *.

"12:30 Earl Elder came in late and seemed to be intoxicated at 12:05 A.M."

July 7, 1981, was the date Elder assaulted Mrs. Reynolds.

Further examples of flagrant violations of the center's rules could be cited for pages and nothing in the direct testimony of numerous witnesses contradicted the impression conveyed by the log book. The Cincinnati Reintegration Center was, in the spring of 1981, a negligently run, poorly supervised institution. In addition to the general requirements concerning the furloughees and the regulations of the reintegration center there were "Special Conditions of Furlough" provided by the division of parole which were to be used by the reintegration center in structuring a program for the rehabilitation of Elder. Those conditions included requirements that while on furlough:

"Subject must participate in a drug treatment program, not methadone maintenance.

"Subject will voluntarily submit to a urinalysis at the request of the furlough counselor.

"Subject is not to possess a driver's license.

"Subject is not to drive.

"Subject must participate in an out-patient psychiatric or psychological program while on furlough or until released by a qualified mental health professional as defined on page 49 of the Amended Substitute House Bill 565.

"Subject must participate in an alcohol treatment program."

These special conditions were reiterated in the "Rules of Furlough" given to Elder when he arrived at the center, and signed by him on March 26, 1981. The parole officer's field report also makes note of Elder's "special conditions, alcohol treatment and psychiatric and drug program." There is absolutely no evidence that these special conditions were implemented. A "First Visit" report from Dorothy Porter, a counselor at the reintegration center, stated that Elder "must participate in

an out-patient psychiatric program and drug program. This writer will make all appointments in order to meet the special condition of subject's furlough." This was never done. Rules and Regulations of the reintegration center state that all furloughees must submit urine tests for drugs or alcohol on demand. No evidence from the daily log or testimony shows that such tests were ever administered to Elder as a follow up to his special conditions for furlough.

The reintegration center was also provided with the pre-parole personality evaluation prepared by the office of psychological services at the London Correctional Institution, dated May 1980. The last paragraph of that evaluation concluded:

"The prognosis for parole completion is mixed. Positive predictor[s] for parole success include Elder's productive institutional adjustment and his firm employment prospects as a civilian. Negative predictors include Elder recidivism and past chemical abuse. If released, Elder should be considered a threat to both property and persons. On parole, the use of alcohol and drugs should be discouraged. Psychological counseling could provide Elder with more realistic coping strategies if he is motivated. In sum, the probability of parole success for Elder is average."

In short, Elder was just the type of personality who required close supervision in order to have any chance for successful reintegration into the community. The center was designed to provide exactly such supervision. It did not. Red flags were provided by the sentences, "[i]f released, Elder should be considered a threat to both property and persons," and "[o]n parole, the use of alcohol and drugs should be discouraged." There is no evidence that the staff implemented any of the special precautions required for Elder's successful reintegration. Trial testimony indicated that some of the staff were not

even aware of this evaluation despite the fact that there were eight counselors for only forty-three furloughees, not including supervisory personnel, an average case load of five or six per counselor. When Elder was arrested for the assault on Reynolds, pornography was found in his room. This material was "bondage" pornography which, when coupled with the record of Elder's previous conviction, might have led the staff to seek some expert counseling for Elder. The staff had the right and duty to periodically inspect the residents' rooms for contraband; yet, this was never done. The center failed in carrying out the prime purpose for its existence, which was the supervision of furloughees while they were being "reintegrated" into the community.

Also included in Elder's file were letters from the Hamilton County Prosecuting Attorney that may well have served as a warning sign of the potential threat Elder posed to the community. In those letters the prosecutor strongly opposed any parole for Elder because of the nature of his previous crime. He wrote on March 10, 1981:

"As previously reflected it is our opinion that this defendant represents a substantial potential risk of committing acts of violence as against innocent victims and should not have been released by way of any type of furlough, parole or any other type of release program."

While the decision of the parole authority to furlough Elder is not at issue, this letter and the previous ones advising against parole put the defendant on notice that special attention should be paid to Elder's case and close supervision was required. The lack of supervision or follow-up on the progress of Elder is illustrated by the testimony of his first employer, Patrick Murray. On direct examination Murray stated he had observed Elder drinking five times in the four weeks Elder was working for him. This was one of the reasons, Mur-

ray testified, that he terminated Elder after less than one month. Another reason was that Elder asked Murray to lie about his working hours and report to the center he was working certain hours when he was somewhere else. After Elder was terminated, Murray testified, no one from the center ever contacted him as to why Elder was terminated, or what his work habits were while he was employed.

The lack of supervision by the staff is evidenced by discrepancies between the program time sheets kept by the center and the "Weekly Time Record" filled out by Elder's second employer, Lewin Electric Co. A comparison of these records shows that the time sheets have Elder checked out for many more hours than the work records indicate. There was no evidence presented that any of the staff at the center verified or attempted to verify that Elder was actually at work when he claimed he was. In addition to the problems with the program time sheets, the supplemental time sheets show Elder was late returning to the center five times between May 3, 1981 and July 7, 1981. Supplemental time was time allowed for residents of the center to visit relatives or others on an approved visitor list. These visits were to be pre-approved and certified every night. Under no circumstances were residents allowed to return after 11:00 p.m. on weekdays or after midnight on Friday or Saturday. The supplemental time sheets show Elder returned past 11:00 on five occasions and his location while on supplemental time was seldom verified. In addition, the records reflect that Elder visited people who were not on the approved list. No evidence was offered that Elder received any reprimand, restrictions, or penalties for these obvious rule violations. The general pattern of negligence at the reintegration center was so pervasive that given the special circumstances of Elder's case, this court

has no difficulty in finding the actions of Elder a foreseeable result of the defendant's negligence.

On July 7, 1981, Elder left the Cincinnati Reintegration Center some time after 7:00 a.m. to go to his job with the Lewin Electric Co. Elder was supposed to return from work at 6:30 p.m. but was not actually signed in until 9:15 p.m. No attempt was made by the center to verify where he was for those three hours. In fact, it was testified at trial that Elder's employer actually called the center during the day to inquire as to Elder's whereabouts and to report that Elder was out driving the company van. After working hours, residents of the center were allowed to be sent out on supplemental time until 11:00 p.m. on weekdays. The rules for use of the supplemental time were that the resident had to first return to the center and sign in to end his work time or program time; then he had to sign out again to begin his supplemental time. However, testimony and notations in the log book show that it was common practice for residents to call in and have a counselor "switch them over" from program time to supplemental time. This is what Elder did on July 7, 1981. A phone number was to be left with the center where a resident could be reached so that counselors could verify that a resident was actually where he was supposed to be on supplemental time. Although the supplemental time records kept by the center do show an occasional call made to verify Elder's location on supplemental time while he was a resident, they also show a number of times where verification was attempted but not made. The evidence and testimony given at trial show no disciplinary action was ever taken when Elder was not where he was supposed to be during his supplemental time. On the evening of July 7, 1981, Elder was supposed to be at his mother's house, but no verification call was attempted. At 11:00 p.m. Elder was still not back at the center. No attempt was made to locate him, no one went out to look for him, and the police were not contacted. Between 11:00 p.m. and midnight on July 7, 1981, Earl Elder went to the home of Mrs. Reynolds, raped her, beat her and left her naked body on the floor of her kitchen with her head in the oven. At 12:30 on the morning of July 8, 1981, the following notation was made in the center's log book, " * * * Earl Elder came in late and seemed to be intoxicated at 12:05 A.M."

The injuries suffered by Mrs. Reynolds are almost too horrible to contemplate. She is currently a permanent total care patient at Drake Hospital in Cincinnati. The present condition of Mrs. Reynolds was effectively illustrated to the court by way of a videotape taken at Drake Hospital, and shown at trial. She is almost completely paralyzed and suffers contractive deformities of all extremities. She can move her arms a few inches but has no functional use of her hands. She cannot feed herself or even turn on the television which remains her only source of entertainment or distraction. She cannot breath normally and breathes through a tracheotomy tube which must be cleared every eight hours by the painful insertion of a suction tube into her throat. She must be fed through a gastrectomy tube placed into her stomach. It is difficult to evaluate her mental state at present. There is no doubt she suffers from significant mental retardation, but she seems at the very least to recognize her mother and her daughter and is able to watch television and make a conscious choice as to what she wants to watch. The expert testimony varied as to Mrs. Reynolds' life expectancy, but this court accepts a figure of twenty-six years as a reasonable expectation given her present medical condition, foreseeable complications, and expected treatment. In addition to the physical damage suffered by Mrs. Reynolds, her everyday pain

and suffering is difficult to comprehend. She would seem to be conscious enough of her condition to suffer the terrible mental anguish of facing the rest of her life in a hospital bed unable to communicate with the world around her, and unable to provide guidance and support to her only daughter.

While recognizing that the standard of proof in this case is simply a preponderance of the evidence, this court finds the evidence presented by the plaintiff is clear and convincing on the issues of defendant's negligence, foreseeability, proximate cause and the severity of damages. The defendant failed to confine Elder under any definition of confinement one might choose to consider, including that proposed by the defendant. This was negligence *per se.* The defendant's administration and supervision of the Cincinnati Reintegration Center could most charitably be called inept. To allow the state of affairs that persisted there in the spring and summer of 1981 borders on recklessness and was most certainly negligent. To allow a furloughee with the criminal background, history of alcohol and drug abuse, and psychological evaluation of Elder to live in such an environment as existed at the Cincinnati Reintegration Center was negligent. That a furloughee with the background of Elder would commit a violent assault if not properly supervised was foreseeable. The negligence of the defendant was the proximate cause of Mrs. Reynolds' injuries. This is a question of fact, as stated by Dean Prosser:

"Causation is a fact. It is a matter of what has in fact occurred. A cause is a necessary antecedent: in a very real and practical sense, the term embraces all things which have so far contributed to the result that without them would not have occurred. It covers not only positive acts and active physical forces, but also pre-existing passive conditions which have played a material part in bringing about the event. In particular, it covers the defendant's omissions as well as his acts. * * * It is familiar law that if such omissions are culpable they will result in liability." Prosser, Law of Torts (4 Ed. 1971), at 237-238.

The omissions of the defendant in its supervision of Elder have been exhaustively recited, and there is no dispute that the present condition of Mrs. Reynolds is the result of the assault by Elder.

Therefore, this court finds liability on the part of the defendant state of Ohio. Judgment is hereby entered for the plaintiff in the amount $2,482,000.

*Judgment for plaintiff.*

GORMAN, CLINE and STAPLETON, JJ., concur.

GORMAN, J., of the Cuyahoga County Court of Common Pleas, CLINE, J., retired, of the Probate Court of Pickaway County, and STAPLETON, J., of the Brown County Court of Common Pleas, sitting by assignment in the Court of Claims.